# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| RALPH S. JANVEY, IN HIS CAPACITY AS COURT-APPOINTED RECEIVER FOR THE STANFORD INTERNATIONAL BANK, LTD., ET AL. | § § § § | |
| Plaintiff, | § § | Case No. 03:09-CV-0724-N |
| v. | § § | |
| JAMES R. ALGUIRE, ET AL. | § § | |
| Defendants. | § § | |

| | | |
|---|---|---|
| RALPH S. JANVEY, IN HIS CAPACITY AS COURT-APPOINTED RECEIVER FOR THE STANFORD INTERNATIONAL BANK, LTD., ET AL. | § § § § | |
| Plaintiff, | § § | Case No. 03:10-CV-0366-N |
| v. | § § | |
| MIGUEL VENGER, ET AL. | § § | |
| Defendants. | § § | |

| | | |
|---|---|---|
| RALPH S. JANVEY, IN HIS CAPACITY AS COURT-APPOINTED RECEIVER FOR THE STANFORD INTERNATIONAL BANK, LTD., ET AL. | § § § § | |
| Plaintiff, | § § | Case No. 03:10-CV-0415-N |
| v. | § § | |
| JUAN JOSE RODRIGUEZ POSADA, ET AL. | § § | |
| Defendants. | § § | |

RALPH S. JANVEY, IN HIS CAPACITY AS      §
COURT-APPOINTED RECEIVER FOR THE         §
STANFORD INTERNATIONAL BANK, LTD.,       §
ET AL.                                   §
                                         §       Case No. 03:10-CV-0478-N
            Plaintiff,                   §
                                         §
v.                                       §
                                         §
GILBE CORP., ET AL.                      §
                                         §
            Defendants.                  §

_____

RALPH S. JANVEY, IN HIS CAPACITY AS      §
COURT-APPOINTED RECEIVER FOR THE         §
STANFORD INTERNATIONAL BANK, LTD.,       §
ET AL.                                   §
                                         §       Case No. 03:10-CV-0528-N
            Plaintiff,                   §
                                         §
v.                                       §
                                         §
BUCK'S BITS SERVICE, INC., ET AL.        §
                                         §
            Defendants.                  §

_____

RALPH S. JANVEY, IN HIS CAPACITY AS      §
COURT-APPOINTED RECEIVER FOR THE         §
STANFORD INTERNATIONAL BANK, LTD.,       §
ET AL.                                   §
                                         §       Case No. 03:10-CV-0617-N
            Plaintiff,                   §
                                         §
v.                                       §
                                         §
NANCY R. JOHNSON, ET AL.                 §
                                         §
            Defendants.                  §

_____

RALPH S. JANVEY, IN HIS CAPACITY AS          §
COURT-APPOINTED RECEIVER FOR THE             §
STANFORD INTERNATIONAL BANK, LTD.,           §
ET AL.                                        §
                                              §      Case No. 03:10-CV-0725-N
               Plaintiff,                     §
                                              §
v.                                            §
                                              §
JAMES C. BARR, ET AL.                         §
                                              §
               Defendants.                    §

_____

RALPH S. JANVEY, IN HIS CAPACITY AS          §
COURT-APPOINTED RECEIVER FOR THE             §
STANFORD INTERNATIONAL BANK, LTD.,           §
ET AL.                                        §
                                              §      Case No. 03:10-CV-0844-N
               Plaintiff,                     §
                                              §
v.                                            §
                                              §
INDIGO TRUST, ET AL.                          §
                                              §
               Defendants.                    §

_____

RALPH S. JANVEY, IN HIS CAPACITY AS          §
COURT-APPOINTED RECEIVER FOR THE             §
STANFORD INTERNATIONAL BANK, LTD.,           §
ET AL.                                        §
                                              §      Case No. 03:10-CV-0931-N
               Plaintiff,                     §
                                              §
v.                                            §
                                              §
TONYA DOKKEN, ET AL.                          §
                                              §
               Defendants.                    §

_____

RALPH S. JANVEY, IN HIS CAPACITY AS          §
COURT-APPOINTED RECEIVER FOR THE             §
STANFORD INTERNATIONAL BANK, LTD.,           §
ET AL.                                       §
                                             §        Case No. 03:10-CV-1002-N
                 Plaintiff,                  §
                                             §
v.                                           §
                                             §
JOSE MANUEL FERNANDEZ, ET AL.                §
                                             §
                 Defendants.                 §

_____

**BRIEF IN SUPPORT OF**
**RECEIVER'S MOTION FOR PARTIAL SUMMARY JUDGMENT**
**AGAINST CERTAIN STANFORD NET WINNER INVESTORS**

_____

BAKER BOTTS L.L.P.
Kevin M. Sadler
Texas Bar No. 17512450
kevin.sadler@bakerbotts.com
Robert I. Howell
Texas Bar No. 10107300
robert.howell@bakerbotts.com
David T. Arlington
Texas Bar No. 00790238
david.arlington@bakerbotts.com
1500 San Jacinto Center
98 San Jacinto Blvd.
Austin, Texas 78701-4039
(512) 322-2500
(512) 322-2501 (Facsimile)

Timothy S. Durst
Texas Bar No. 00786924
tim.durst@bakerbotts.com
2001 Ross Avenue
Dallas, Texas 75201
(214) 953-6500
(214) 953-6503 (Facsimile)

**ATTORNEYS FOR RECEIVER RALPH S. JANVEY**

TABLE OF CONTENTS

Table of Authorities..................................................................................................... ii

Summary..................................................................................................................1

Arguments & Authorities ........................................................................................2

     I.     The summary judgment standard. .........................................................2

     II.    The evidence conclusively establishes that SIB was a Ponzi scheme and that the Stanford Net Winners received substantial Net Winnings from their SIB CDs. ......................................................................................3

          A.     SIB was a Ponzi scheme..............................................................3

          B.     The Stanford Net Winners received substantial Net Winnings from their investments in SIB CDs. ...................................................9

     III.   As a matter of law, Net Winnings paid to the Stanford Net Winners were fraudulent under TUFTA and, therefore, subject to recovery by the Receiver. ................................................................................................10

          A.     The Stanford Net Winners are liable for their Net Winnings under section 24.005(a)(1), the "actual fraud" provision of TUFTA. .................12

          B.     The Stanford Net Winners are liable for their Net Winnings under section 24.005(a)(2), the "constructive fraud" provision of TUFTA. ........................................................................................16

Conclusion & Prayer ............................................................................................17

Certificate of Service ...........................................................................................19

TABLE OF AUTHORITIES

**Page(s)**

CASES

*Armstrong v. Collins*,
 Nos. 01 Civ. 2437(PAC), 02 Civ. 2796(PAC), 02 Civ. 3620(PAC), 2010 WL
 1141158 (S.D.N.Y. Mar. 24, 2010)...................................................................6, 11, 14, 17

*Barrington Group Ltd., Inc. v. Classic Cruise Holdings S. de R.L.*,
 Civil Action No. 3:08-cv-1813-B, 2010 WL 184307 (N.D. Tex. Jan. 15, 2010)...............2

*Bassett v. Am. Nat'l Bank*,
 145 S.W.3d 692 (Tex. App.—Fort Worth 2004, no pet.)....................................................2

*Donell v. Kowell*,
 533 F.3d 762 (9th Cir. 2008).................................1, 3, 10, 11, 13, 14, 15, 16, 17

*Drenis v. Haligiannis*,
 452 F. Supp. 2d 418 (S.D.N.Y. 2006) ................................................................................13

*Duncan v. Cessna Aircraft Co.*,
 665 S.W.2d 414 (Tex. 1984) ..............................................................................................10

*Gutierrez v. Collins*,
 583 S.W.2d 312 (Tex. 1979) ..............................................................................................10

*In re Bayou Group, LLC*,
 362 B.R. 624 (Bankr. S.D.N.Y. 2007) ...............................................................................13

*In re Bonham*,
 229 F.3d 750 (9th Cir. 2000) ...............................................................................................3

*In re Canyon Systems Corp.*,
 343 B.R. 615 (Bankr. S.D. Ohio 2006) ..............................................................................16

*In re Hedged-Investors Assocs., Inc.*,
 84 F.3d 1286 (10th Cir. 1996) ......................................................................................10, 14

*In re The Heritage Org., L.L.C.*,
 413 B.R. 438 (Bankr. N.D. Tex. 2009) ..............................................................................10

*In re IFS Fin. Corp.*,
 417 B.R. 419 (Bankr. S.D. Tex. 2009) ..........................................................................12, 13

*In re Manhattan Inv. Fund Ltd.*,
 397 B.R. 1 (S.D.N.Y. 2007) .............................................................................................6, 13

*In re Slatkin*,
  525 F.3d 805 (9th Cir. 2008) ................................................................................6

*In re United Energy Corp.*,
  944 F.2d 589 (9th Cir. 1991) ...............................................................................3

*In re Wiand*,
  2007 WL 963165 (M.D. Fla. Mar. 27, 2007) ......................................................1

*Janvey v. Alguire*,
  628 F.3d 164 (5th Cir. 2010) ...........................................1, 3, 8, 9, 11, 12, 13, 16

*Pendergest-Holt v. Certain Underwriters at Lloyd's of London*,
  No. H-09-3712, 2010 WL 4026068 (S.D. Tex. Oct. 13, 2010).........................3, 4

*Quilling v. Cristell*,
  No. Civ. A. 304cv252, 2006 WL 316981 (W.D.N.C. Feb. 9, 2006)................................1

*Quilling v. Schonsky*,
  247 F. App'x 583 (5th Cir. 2007) .......................................................................12

*Scholes v. Lehmann*,
  56 F.3d 750 (7th Cir. 1995) ....................................................................6, 10, 14

*SEC v. Cook*,
  No. CA 3:00-CV-272-R, 2001 WL 256172 (N.D. Tex. Mar. 8, 2001)................................11

*SEC v. Forte*,
  Civil Nos. 09-63, 09-64, 2009 WL 4809804 (E.D. Pa. Dec. 15, 2009) ...............10, 11, 15

*SEC v. Forte*,
  Civil Nos. 09-63, 09-64, 2010 WL 939042 (E.D. Pa. Mar. 17, 2010) .............................14

*SEC v. Res. Dev. Int'l, LLC*,
  487 F.3d 295 (5th Cir. 2007) ................................................................12, 13, 14

*Slone v. Lassiter*,
  406 B.R. 778 (Bankr. S.D. Ohio 2009) ..............................................................14

*Warfield v. Byron*,
  436 F.3d 551 (5th Cir. 2006) ...............................................12, 13, 14, 15, 16

*Warfield v. Carnie*,
  Civil Action No. 3:04-cv-633-R,
  2007 WL 1112591 (N.D. Tex. Apr. 13, 2007) ...............................1, 10, 14, 15

### STATUTES

TEX. BUS. & COM. CODE ANN. §§ 24.001-.013 (West 2009) ........................................1

TEX. BUS. & COM. CODE ANN. § 24.005 ........................................................ 10, 11, 12, 15, 16, 17

TEX. BUS. & COM. CODE ANN. § 24.008 ............................................................................ 11, 12

TEX. BUS. & COM. CODE ANN. § 24.009 ...................................................................... 11, 12, 13, 15

TEX. BUS. & COM. CODE ANN. § 24.013 ................................................................................... 17

## OTHER AUTHORITIES

FED. R. CIV. P. 56(c)(2) ........................................................................................................ 2

FED. R. EVID. 807 ................................................................................................................. 6

Restatement (Second) of Conflict of Laws § 145. ......................................................... 10

## SUMMARY

Ralph S. Janvey, in his capacity as Receiver of Stanford International Bank, Ltd. ("SIB") and other Stanford entities, in accordance with the Court's briefing schedule, moves for partial summary judgment against the Stanford Investors who have answered or otherwise appeared in each of the above-captioned cases prior to May 24, 2011 (collectively, the "Stanford Net Winners") for recovery of all amounts SIB paid to the Stanford Net Winners in excess of their respective investments in SIB (their "Net Winnings").[1]  As a matter of law, such payments are voidable fraudulent transfers under the Texas Uniform Fraudulent Transfer Act ("TUFTA"), TEX. BUS. & COM. CODE ANN. §§ 24.001-.013 (West 2009).[2]

Many thousands of SIB CD investors lost most or all of their investments.  But the Stanford Net Winners did not suffer that fate.  They, instead, recovered the full amount of their investments *plus* hundreds of millions more in purported interest payments.  These payments, however, were not from earnings on SIB's investment of CD proceeds (SIB's ostensible business model).  SIB was a Ponzi scheme; the money it paid to existing investors came overwhelmingly from the sale of CDs to new investors.  Decisions from the Fifth Circuit, from this District, and indeed from courts all across the nation hold that, irrespective of the

---

[1]      The Receiver also has claims against the Stanford Net Winners and other Stanford Investors for recovery of transfers that supposedly represented repayments of the "principal" amounts of the Stanford Investors' investments. Recovery of "principal" amounts is not the subject of the instant Motion for Partial Summary Judgment.  The Receiver expects, however, to prosecute his claims for so-called "principal" amounts against Stanford Net Winners and other Stanford Investors who cannot establish their good faith.  The Receiver's claim for attorneys' fees and costs will be determined at a later date.

[2]      "Courts have routinely applied UFTA to allow receivers or trustees in bankruptcy to recover monies lost by Ponzi-scheme investors." *Donell v. Kowell*, 533 F.3d 762, 767 (9th Cir. 2008); s*ee also Janvey v. Alguire*, 628 F.3d 164, 183-184 (5th Cir. 2010) (motion for reh'g *en banc* pending) ("[R]eceivers are legal hybrids, imbued with rights and obligations analogous to the various actors required to effectively manage an estate in the absence of the 'true' owner. . . . [R]eceivers have long held the power to assert creditor claims."); *Warfield v. Carnie*, Civil Action No. 3:04-cv-633-R, 2007 WL 1112591, at *9 (N.D. Tex. Apr. 13, 2007) ("A receiver of an alleged Ponzi scheme may sue under the UFTA to recover funds paid from the entity in receivership."); *In re Wiand*, 2007 WL 963165, at *2 (M.D. Fla. Mar. 27, 2007) (receiver has standing under the Florida UFTA); *Quilling v. Cristell*, No. Civ. A. 304cv252, 2006 WL 316981, at *5-6 (W.D.N.C. Feb. 9, 2006) (receiver has standing under either North Carolina or Florida's UFTA).

transferee's good faith, payments from a Ponzi scheme that exceed the amount of the transferee's

investment are, as a matter of law, fraudulent transfers subject to recovery by the Receiver of the

Ponzi entity.

### ARGUMENTS & AUTHORITIES

**I.      The summary judgment standard.**

Summary judgment "should be rendered if the pleadings, the discovery and

disclosure materials on file, and any affidavits show that there is no genuine issue as to any

material fact and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P.

56(c)(2).  Therefore, a plaintiff is entitled to summary judgment as to any claim he can establish

as a matter of law.  As this Court has held,

> [a] plaintiff is entitled to judgment as a matter of law where it
> present[s] sufficient summary judgment evidence to establish each
> element of its cause of action.  Once the movant has met its
> burden, the non-movant must show that summary judgment is not
> appropriate.  This burden is not satisfied with some metaphysical
> doubt as to material facts, by conclusory allegations, by
> unsubstantiated assertions, or by only a scintilla of evidence.
> Instead, the non-moving party must come forward with specific
> facts showing that there is a *genuine issue for trial.*

*Barrington Group Ltd., Inc. v. Classic Cruise Holdings S. de R.L.,* Civil Action No. 3:08-cv-

1813-B, 2010 WL 184307, at *5 (N.D. Tex. Jan. 15, 2010) (emphasis in original; internal

citations and quotation marks omitted).  If a defendant seeks to defeat summary judgment by

relying on an affirmative defense, to succeed, the defendant must "'come forward with summary

judgment evidence sufficient to raise an issue of material fact on each element of the defense.'"

*Id.* (quoting *Bassett v. Am. Nat'l Bank*, 145 S.W.3d 692, 696 (Tex. App.—Fort Worth 2004, no

pet.)).

## II.   The evidence conclusively establishes that SIB was a Ponzi scheme and that the Stanford Net Winners received substantial Net Winnings from their SIB CDs.

### A.   SIB was a Ponzi scheme.

"Generically, a Ponzi scheme is a phony investment plan in which monies paid by later investors are used to pay artificially high returns to the initial investors, with the goal of attracting more investors."  *In re Bonham*, 229 F.3d 750, 759 n.1 (9th Cir. 2000).  "The fraud consists of funneling proceeds received from new investors to previous investors in the guise of profits from the alleged business venture, thereby cultivating an illusion that a legitimate profit-making business opportunity exists and inducing further investment."  *Donell,* 533 F.3d at 767 n.2 (quoting *In re United Energy Corp.*, 944 F.2d 589, 590 n.1 (9th Cir. 1991)).

The evidence conclusively establishes that SIB was a Ponzi scheme from the beginning.  *See* Exhibit 2 at 16:16-17, 21:6-8, 21:15-17 (App.[3] at 49, 54) (admitting the Stanford fraud was a "massive Ponzi scheme ab initio"); *see also* Exhibit 5 at ¶ 8 (App. at 149) ("James Davis admitted in his rearraignment that the Stanford enterprise was a Ponzi scheme from the beginning, and I have not seen anything in the records I have reviewed to indicate otherwise."); Exhibit 6 at ¶ 5 (App. at 204) ("The Stanford Entities were operating as a Ponzi scheme from at least 1999 forward[.]").  Karyl Van Tassel, an experienced Certified Public Accountant and a Senior Managing Director of FTI Consulting, Inc., one of the firms the Receiver engaged to assist him in his investigations and asset searches, has given declarations in which she confirms that the Stanford enterprise was a Ponzi scheme.[4]  She summarizes her findings as follows:

---

[3]      The Appendix in Support of the Receiver's Motion is referred to herein as the "Appendix" or by the abbreviation "App."  The Exhibits comprising the Appendix are described and defined in the Receiver's Motion.

[4]      The Fifth Circuit recently noted that Ms. Van Tassel's declaration in the litigation surrounding the preliminary injunction issued against certain former Stanford employees "provide[s] clear, numerical support for the creative reverse engineering undertaken by Stanford executives to accomplish the Ponzi scheme[.]"  *Alguire*, 628 F.3d at 176.  Likewise, in a recent order concerning a preliminary injunction regarding insurance coverage in the related criminal cases, Judge Atlas credited the reliability of Ms. Van Tassel's testimony concerning the existence of

[M]y findings are consistent with the SEC's allegations and James Davis's admission that SIB was a Ponzi scheme. SIB was insolvent (*i.e.*, its liabilities exceeded the fair value of its assets) from at least 2004 and probably for much longer, yet it continued selling CDs to the end. It induced investors to buy CDs by offering substantially above-market rates, issuing financial statements and other data that significantly overstated its earnings and assets, and misrepresenting its business model, investment strategy, financial strength, the safety and nature of its investments and other facts important to investors. SIB incentivized Stanford-affiliated financial advisors to convince their clients to purchase SIB CDs over other kinds of investments by paying the financial advisors above-market commissions and other compensation tied to CD sales and to the retention of the CDs within SIB. SIB's actual (as opposed to reported) earnings and assets, however, were insufficient to meet its CD payment obligations. SIB could only keep the scheme going by selling yet more CDs and using the proceeds to pay redemptions, interest and operating expenses. Significant sums were also diverted to finance Allen Stanford's opulent life style of yachts, jet planes, travel, multiple homes, company credit cards, etc. Davis, Holt and other insiders were paid handsomely for their complicity. Davis, as part of his plea agreement, agreed to forfeit $1 billion in personal assets derived from the Ponzi scheme.[5]

\*      \*      \*

Based on FTI's continued investigation of the operations of the Stanford Entities and on the data and documents cited or incorporated [into the supplemental declaration], it is my opinion that: [t]he Stanford Entities were operating as a Ponzi scheme from at least 1999 forward; SIB was insolvent (*i.e.*, its liabilities exceeded the fair value of its assets) from at least 1999 forward; Robert Allen Stanford's . . . reported income from at least 1999 forward is comprised almost exclusively from the Stanford Entities, including proceeds from SIB CDs; and SFGC was

---

the Ponzi scheme: "The Court receives in evidence and credits Van Tassel's conclusions based on detailed analysis of documentary evidence, augmented by interviews of persons with firsthand knowledge, concerning the source and use of [SIB] funds, [SIB]'s financial condition at various points in time, the timing and cost of assets acquired by various Stanford entities (*e.g.*, real estate and private equity investments), and the compensation of financial advisors who sold [SIB] CDs. . . . The Court finds the Van Tassel Declarations, to the extent received in evidence, have strong 'circumstantial guarantees' of their trustworthiness. Van Tassel and FTI performed extraordinarily detailed analysis, as described in the Declarations and summarized above." *Pendergest-Holt v. Certain Underwriters at Lloyd's of London*, No. H-09-3712, 751 F. Supp. 2d 876, 880-81, 881 n.10 (S.D. Tex. 2010). Judge Atlas also pointed out that "Van Tassel's findings dovetail with statements given by Davis in his plea agreement." *Id.* at 889.
[5]      Exhibit 5 at ¶ 8 (App. at 149-150).

insolvent (*i.e.*, its liabilities exceeded the fair value of its assets) from at least 2000 forward and received SIB CD funds.[6]

In addition, FTI's review and analysis of records and funds tracing for the time period January 1, 2004 through February 17, 2009 shows that the overwhelming majority of the funds used to make purported SIB CD interest and redemption payments to investors was proceeds from sales of new SIB CDs to investors.[7]  In her declarations, Ms. Van Tassel describes in detail that: the Stanford Entities were operating a Ponzi scheme from at least 1999 forward; SEC examiners found that Stanford was a Ponzi scheme as early as 1997; SIB's investment returns were too good to be true; SIB's assets and earnings were fraudulently overstated; SIB relied on new CD sales to pay interest, redemptions and operating expenses, including commissions to Stanford employees; SIB's referral and commission rate structure was economically unsustainable; without income from the sale of CDs, SIB was insolvent from at least 1999 forward; SIB's financial statements were reverse-engineered from at least 1999 forward; that information available to SGC and financial advisors about SIB CDs and SIB's investment portfolio was inadequate; SIB used a small Antiguan auditing firm and made improper payments to it; R. Allen Stanford's reported income was based almost exclusively on funds from the Stanford Entities; there were several badges of fraud in the transfers and purported loans from the Stanford Entities to R. Allen Stanford; the Ponzi scheme began to unravel beginning in October 2008, when new CD sales fell below the amount necessary to pay interest and redemptions; and the resulting cash flow crisis caused a rapid liquidation of most of

---

[6]     Exhibit 6 at ¶ 5 (App. at 204-205).
[7]     Exhibit 3 at ¶¶ 14, 24, 38-41 (App. at 67-68, 70-71, 78-79); Exhibit 4 at ¶¶ 15-18 (App. at 139-140); *see also* Exhibit 4 at ¶ 19 (App. at 140-141) (noting that "it is more likely than not that the overwhelming majority of payments to SIB CD investors in 2003 consisted of proceeds from the sale of new CDs to investors").

SIB's investment portfolio, which to begin with was only a small fraction of the size reported to the public.[8]

Ms. Van Tassel's findings are corroborated by James Davis's guilty plea to charges that he conspired with Allen Stanford and others to orchestrate a Ponzi scheme in violation of federal securities laws.[9]  In the factual statement to his plea agreement, Davis, SIB's Chief Financial Officer, admitted that the Stanford enterprise was a "massive Ponzi scheme whereby CD redemptions ultimately could only be accomplished with new infusions of investor funds."[10]  According to Davis's plea agreement, the scheme began in the 1980s, with SIB's predecessor, Guardian International Bank, Ltd., which was based in the Caribbean island nation of Montserrat.  Even more than twenty years ago, Allen Stanford was instructing Davis, then Guardian's controller, to falsify reported revenues and asset balances.[11]  When Montserrat regulatory scrutiny became too intense, Stanford moved the business to Antigua and re-named it SIB.[12]

---

[8]     Exhibit 5 at ¶¶ 8-26 (App. at 149-157); Exhibit 6 at ¶¶ 5-47 (App. at 204-228).

[9]     In fraudulent transfer suits arising from a Ponzi scheme, guilty pleas are competent summary judgment evidence for the existence of the Ponzi scheme.  This was the holding of the Ninth Circuit in *In re Slatkin*, 525 F.3d 805, 811-12 (9th Cir. 2008), an appeal from a summary judgment granted in favor of a bankruptcy trustee for recovery of profit payments made to investors of a failed investment company.  The investors argued on appeal that the trial court improperly considered the guilty plea of the investment firm's owner, in which he conceded that he and the firm had been involved in a Ponzi scheme.  *Id.*  The Ninth Circuit affirmed the summary judgment, holding that "the plea agreement is admissible under Federal Rule of Evidence 807, and . . . the bankruptcy court did not, therefore, abuse its discretion when it considered the plea agreement in granting summary judgment." *Id.* at 812; *see also Scholes v. Lehmann,* 56 F.3d 750, 762 (7th Cir. 1995) (the trial court properly admitted a Ponzi fraudster's plea agreement as evidence that the entity in receivership had been operated as a Ponzi scheme.); *Armstrong v. Collins*, Nos. 01 Civ. 2437(PAC), 02 Civ. 2796(PAC), 02 Civ. 3620(PAC), 2010 WL 1141158, at *24 (S.D.N.Y. Mar. 24, 2010) ("Yagalla's testimony that he ran a Ponzi scheme, *the fact he pled guilty to conduct amounting to a Ponzi scheme*, that he did not contest the SEC's allegations that he ran a Ponzi scheme, and Fleisher's conclusion that Yagalla indeed ran a Ponzi scheme, lead to the inevitable conclusion that Yagalla did, in fact, run a Ponzi scheme . . .") (emphasis added); *In re Manhattan Inv. Fund Ltd.*, 397 B.R. 1, 12 (S.D.N.Y. 2007) ("There is ample support in the record for [the existence of a Ponzi scheme]. For example, the criminal information to which Berger pled guilty set forth that Berger continuously falsified the Fund's performance, sent account statements to current investors that reflected significant gains, concealed the Fund's true state from its auditors, and used his falsified records to attract new investors.").

[10]     Exhibit 1 at ¶ 17(n) (App. at 15).

[11]     *Id.* at ¶ 17(a) (App. at 12).

[12]     *Id.* at ¶ 17(a)-(b) (App. at 12-13).

Stanford and Davis operated SIB in conjunction with a network of over 130 separate entities, generically referred to as "Stanford Financial Group," to carry out their fraudulent scheme.[13]   Davis was initially SIB's controller and then CFO for both it and its parent company Stanford Financial Group.[14]   Stanford, Davis and others regularly misrepresented SIB's revenue, asset values, investment allocation, strategy, liquidity, and safety.[15]   Each year, SIB's financial statements—compiled by Davis and others, at Allen Stanford's direction—falsely represented that SIB had strong revenue and held more assets than the year before.[16]   Revenue figures, however, were "reverse engineered" to match whatever fictitious return on investment Stanford, Davis, and others decided to show.[17]   Asset values were inflated as necessary to offset liabilities to CD holders.[18]   Reported assets climbed from $1.2 billion in 2001 to $8.5 billion at the end of 2008.[19]   Unknown to the public, SIB's assets included approximately $2 billion in notes receivable from Allen Stanford and $3.2 billion in real estate.[20]   These asset values were fictitious: Stanford had no ability to repay the so-called loans because his wealth consisted almost entirely of a group of deeply insolvent companies engaged in a Ponzi scheme.[21]   And the $3.2 billion in real estate was raw land in Antigua that had just been purchased earlier in 2008 for only $65 million.[22]   The purpose of overstating SIB's earnings, revenue, assets, and safety was to falsely assure investors that SIB was financially strong and that SIB CDs were attractive low-risk investments.[23]

---

[13]     Exhibit 5 at ¶¶ 9-10 (App. at 150).
[14]     Exhibit 1 at ¶ 17(b) (App. at 13); *see also* Exhibit 5 at ¶¶ 8, 10 (App. at 149-150).
[15]     Exhibit 1 at ¶ 17(c)-(i), (k)-(n) (App. at 13-16).
[16]     *Id.* at ¶ 17(h)-(l) (App. at 14-15).
[17]     *Id.* at ¶ 17(l) (App. at 15).
[18]     *Id.* at ¶ 17(k) (App. at 15).
[19]     *Id.* at ¶ 17(n) (App. at 15-16).
[20]     *Id.* at ¶ 17(cc) (App. at 19).
[21]     *Id.*
[22]     *Id.*
[23]     *Id.* at ¶ 17(c) (App. at 13).

The true state of affairs, though, was much different: from the beginning of its existence, SIB was insolvent and losing money, which made it dependent on bringing in new CD investor funds to keep the charade going.[24]

To avoid exposure of the Ponzi scheme, Stanford used investor proceeds to bribe key officials of the Antiguan Financial Services Regulatory Commission (the "FSRC"), the Antiguan agency charged with regulating SIB and regularly examining its records.[25]  Stanford's purchase of the FSRC's cooperation was so complete that the FSRC's CEO permitted Stanford's attorneys to draft the FSRC's response to an inquiry from the SEC that suggested SIB was a "possible Ponzi scheme."[26]  Stanford also bribed SIB's outside auditor by paying him, over and above his billed professional fees, substantial sums from a secret Swiss bank account.[27]

This evidence establishes conclusively that the Stanford fraud, directed by Stanford and Davis and accomplished through the operations of SIB, SFGC, and the myriad other Stanford entities, was a Ponzi scheme from the beginning.[28]  In fact, both this Court and the Fifth Circuit Court of Appeals have found that the Stanford fraud was a Ponzi scheme from the beginning.  *See Alguire*, 628 F.3d at 168, 176-178, 180, 183-185; [Case No. 03:09-CV-0724-N, Doc. 456 at 2, 11, 13]; [Case No. 03:09-CV-0298-N, Doc. 1315 at 10-11, 14].  This Court stated, in particular, that: "the Receiver present[ed] ample evidence that the Stanford scheme . . . was a Ponzi scheme"; "[t]he Stanford scheme operated as a classic Ponzi scheme, paying dividends to early investors with funds brought in from later investors"; and "[t]he Court finds that the

---

[24]      *Id.* at ¶ 17(n) (App. at 15).
[25]      *Id.* at ¶¶ 17(o)-(s) (App. at 16-17).
[26]      *Id.* at ¶ 17(t) (App. at 17).
[27]      *Id.* at ¶ 17(q) (App. at 16); Exhibit 6 at ¶¶ 25-30 (App. at 216-218).
[28]      *See* Exhibit 1 at ¶¶ 17(a)-(b) (App. at 12-13) (explaining that Guardian International Bank, Ltd. became SIB in early 1990); *see also* Exhibit 2 at 16:16-17, 21:6-8, 21:15-17 (App. at 49, 54) (explaining that the Stanford enterprise was a Ponzi scheme from the beginning).

Stanford enterprise operated as a Ponzi scheme . . . ."  [*See* Case No. 03:09-CV-0724-N, Doc.

456 at 2, 11, 13.]  The Fifth Circuit upheld these findings, stating:

> We find that the district court did not err in finding that the Stanford enterprise operated as a Ponzi scheme.
>
> \*       \*       \*
>
> The Davis Plea and the Van Tassel Declarations provide sufficient evidence to support a conclusion that there is a substantial likelihood of success on the merits that the Stanford enterprise operated as a Ponzi scheme. . . . [The Davis Plea] reflects a classic Ponzi scheme . . . . The Davis Plea, when read as a whole, provides sufficient evidence for the district court to assume that the Stanford enterprise constituted a Ponzi scheme *ab initio*.
>
> \*       \*       \*
>
> The Receiver carried his burden of proving that he is likely to succeed in his prima facie case by providing sufficient evidence that a Ponzi scheme existed . . . .
>
> \*       \*       \*
>
> Here, the Receiver provided evidence of a massive Ponzi scheme . . .  The record supports the fact that Stanford, when it entered receivership, was grossly undercapitalized.

*Alguire*, 628 F.3d at 176-178, 180; *see also id.* at 168, 185.

### B.    The Stanford Net Winners received substantial Net Winnings from their investments in SIB CDs.

The Stanford Net Winners each received from SIB not only full repayment of

their invested principal, but also significant amounts in excess of their investments.   The

Stanford Net Winners to whom this Motion applies, along with their respective Net Winnings

and the cases in which they are defendants, are detailed in Ms. Van Tassel's June 1, 2011

Declaration.[29]   Collectively, the Stanford Net Winners received over $32.3 million in Net

---

[29]        Exhibit 5 at ¶ 26 and at exhibit KVT-4 thereto (App. at 157, 192-196).

Winnings.[30]  As described in detail above and in Ms. Van Tassel's declarations, SIB was not a legitimate bank and did not pay interest out of earnings—it was the engine of a Ponzi scheme that relied on new CD proceeds to pay existing investors.[31]

The Receiver seeks recovery of the Stanford Net Winners' Net Winnings, so that those funds may be equitably distributed among the victims of the Stanford Ponzi scheme. Through this Motion, the Receiver seeks summary judgment on the legal point that the Stanford Net Winners did not, as a matter of law, provide reasonably equivalent value for their Net Winnings.  *See Donell*, 533 F.3d at 772 ("If investors receive more than they invested, '[p]ayments in excess of amounts invested are considered fictitious profits because they do not represent a return on legitimate investment activity.'"); *Carnie*, 2007 WL 1112591, at *12 (N.D. Tex. Apr. 13, 2007) (citing *In re Hedged-Investors Assocs., Inc.*, 84 F.3d 1286, 1290 (10th Cir. 1996)); *see also Scholes*, 56 F.3d at 757-58; *SEC v. Forte*, Civil Nos. 09-63, 09-64, 2009 WL 4809804, at *4 (E.D. Pa. Dec. 15, 2009) (when claims are brought against Ponzi scheme investors, "the general rule is that to the extent innocent investors have received payments in excess of the amounts of principal that they originally invested, those payments are avoidable as fraudulent transfers.").

### III. As a matter of law, Net Winnings paid to the Stanford Net Winners were fraudulent under TUFTA and, therefore, subject to recovery by the Receiver.

Section 24.005(a) of TUFTA[32] specifies when a transfer is fraudulent:

---

[30]     Exhibit 5 at ¶ 26 and at exhibit KVT-4 thereto (App. at 157, 192-196).
[31]     Exhibit 5 at ¶ 26 (App. at 157); Exhibit 6 at ¶¶ 5-13, 31-33 (App. at 204-212, 219).
[32]     The Texas Uniform Fraudulent Transfer Act applies.  A federal court exercising pendent jurisdiction over a state law claim applies the choice of law rule of the state in which it sits.  *Carnie*, 2007 WL 1112591, at *7.  A fraudulent transfer suit sounds in tort.  *Id.*; *In re The Heritage Org., L.L.C.*, 413 B.R. 438, 462 (Bankr. N.D. Tex. 2009).  In tort actions, Texas courts apply the "most significant relationship to the occurrence and the parties" test set out in section 145 of the Restatement (Second) of Conflict of Laws.  *Gutierrez v. Collins,* 583 S.W.2d 312, 318-9 (Tex. 1979); *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 420-21 (Tex. 1984).  Texas is the state with the most significant relationship to the occurrences and parties of this case.  It is where Stanford's global empire was

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or

(2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

> (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

> (B) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

Subsection (a)(1) is referred to as the "actual fraud" ground,[33] and subsection (a)(2) is referred to as the "constructive fraud" ground. *Donell*, 533 F.3d at 770; *Armstrong*, 2010 WL 1141158, at *19-22. If either the (a)(1) or (a)(2) ground is proven, then the Receiver is entitled to a judgment against the transferee "for the value of the asset transferred." TEX. BUS. & COM. CODE ANN.

---

headquartered and from which SIB's sales efforts and strategy were directed. *See, e.g.*, Exhibit 3 at ¶ 7 (App. at 66). More than any other state, it was the focal point of the Stanford fraud. In fact, several of the Stanford Net Winners purchased their SIB CDs through Stanford brokers in Texas. The Receiver represents the interest of defrauded investors in recovering fraudulent transfers. *SEC v. Cook*, No. CA 3:00-CV-272-R, 2001 WL 256172, at *2 (N.D. Tex. Mar. 8, 2001) ("[A] receiver represents not only the entity in receivership, but also the interests of its creditors. . . . Thus, while the debtor would not be entitled to set aside a transfer in fraud of his creditors . . . the receiver acting for the creditors may attack it."); *see also Alguire*, 628 F.3d at 183-184 ("[R]eceivers are legal hybrids, imbued with rights and obligations analogous to the various actors required to effectively manage an estate in the absence of the 'true' owner. . . . [R]eceivers have long held the power to assert creditor claims."). The Receiver resides in and conducts the Receivership's business from Texas. And, importantly, Texas is the venue of this Receivership.

[33]     "Under the actual fraud theory, the receiver may recover the entire amount paid to the winning investor, *including* amounts which could be considered 'return of principal.' However, there is a 'good faith' defense that permits an innocent winning investor to retain funds up to the amount of the initial outlay." *Donell*, 533 F.3d at 771 (emphasis in original); *see also Forte*, 2009 WL 4809804, at *5 ("[A] receiver may, pursuant to the statute's 'actual fraud' provision, allege that the Ponzi scheme operator made transfers to the winning investor 'with actual intent to hinder, delay or defraud' the losing investors. Significantly, the mere existence of a Ponzi scheme is sufficient to establish 'actual intent to defraud.' The receiver alleging fraud may thus recover the entire amount paid to the winning investor, including principal. . . . If the court determines that the investor should have known the investment was 'too good to be true,' it will void the return of principal to the investor.") (internal citations omitted). Although the Receiver's lawsuits against the Stanford Net Winners include claims for return of principal, as previously noted, those claims are not at issue in this Motion. But the Receiver expects to prosecute claims for the "principal" amounts against Stanford Net Winners and other Stanford Investors who cannot demonstrate that they received such payments in good faith.

§§ 24.008(a)(1), 24.009(b).[34]   In this case, the summary judgment evidence conclusively proves

both grounds.

### A.   The Stanford Net Winners are liable for their Net Winnings under section 24.005(a)(1), the "actual fraud" provision of TUFTA.

Various Stanford Net Winners protest in their 12(b) motions to dismiss that they

were "innocent" and that the Complaints must be dismissed because the Receiver has not alleged

that they were involved in the fraud.   But those Stanford Net Winners mischaracterize the actual

elements of a fraudulent-transfer claim.   The intent at issue in subsection 24.005(a)(1) is that of

the "debtor"—in this case, SIB—and not that of the investor who received the transfer.   "The

statute focuses on the intent of the transferor rather than the transferee."   *In re IFS Fin. Corp.*,

417 B.R. 419, 438 (Bankr. S.D. Tex. 2009). In fact, "'the transferees' knowing participation is

irrelevant under [UFTA]' for purposes of establishing the [actual fraud] premise …."   *SEC v.

Res. Dev. Int'l, LLC*, 487 F.3d 295, 301 (5th Cir. 2007) (quoting *Warfield v. Byron*, 436 F.3d

551, 559 (5th Cir. 2006)).

Moreover, if, as in this case, the transferor was engaged in a Ponzi scheme or

similar fraud, then actual intent is conclusively presumed.   "Under the UFTA, transfers made

from a Ponzi scheme are presumptively made with intent to defraud, because a Ponzi scheme is,

as a matter of law, insolvent from inception."   *Quilling v. Schonsky*, 247 F. App'x 583, 586 (5th

Cir. 2007) (affirming summary judgment in favor of receiver); *see also Alguire*, 628 F.3d at 176

("[A] Ponzi scheme 'is, as a matter of law, insolvent from its inception.'").   "In [the Fifth]

circuit, proving that [the debtor] operated as a Ponzi scheme establishes the fraudulent intent

---

[34]      A creditor's ability to obtain a fraudulent transfer judgment is subject to certain defenses set forth in section 24.009 of TUFTA.   However, none of those defenses is available to the Stanford Net Winners under the conclusively established facts of this case.   The only section 24.009 defense that could even facially apply to a Ponzi investment scheme is discussed in section III(A) of this Brief, *infra*.

behind the transfers it made." *Res. Dev. Int'l, LLC*, 487 F.3d at 301.[35]   The Fifth Circuit

reaffirmed this principle in the related litigation involving the preliminary injunction issued

against certain former Stanford employees.  *See Alguire*, 628 F.3d at 178 ("The Receiver carried

his burden of proving that he is likely to succeed in his prima facie case by providing sufficient

evidence that a Ponzi scheme existed—thereby obviating the need to prove fraudulent intent of

the *transferees*[.]") (emphasis in original).   The Ponzi fraudster makes payments to prior

investors "to keep the fraud going by giving the false impression that the scheme is a profitable,

legitimate business."  *Donell*, 533 F.3d at 777.  Therefore, "transfers made in the course of a

Ponzi scheme could have been made for no purpose other than to hinder, delay or defraud

creditors."  *In re Manhattan Inv. Fund Ltd.*, 397 B.R. at 8 (citation omitted).[36]

Section 24.009(a) of TUFTA provides a defense to transferees "who took in good

faith and for a reasonably equivalent value."  As this Court has held, "[a] defendant invoking this

defense has the burden to show *both* objective good faith and reasonable equivalence of

consideration."  [*See* Case No. 03:09-CV-0724-N, Doc. 456 at 13 (emphasis in original).]  The

"good faith" element requires the transferee to establish *objective* good faith; the relevant inquiry

is whether the transferee "objectively knew or should have known" that the transfer was

---

[35]     "The Fifth Circuit's reasoning applies whether the organization neatly fits within a judicially constructed definition of Ponzi scheme or was a fraudulent scheme that had some, but perhaps not all, attributes of the traditional Ponzi scheme.  When an organization perpetuating a fraud makes a transfer necessary for continuation of the fraud, the transfer is made with actual intent to defraud."  *In re IFS Fin. Corp.*, 417 B.R. at 439 n.15.  For example, "[t]he fact that the scheme may have contained some revenue-generating businesses is not sufficient to defeat a finding of fraudulent intent where the revenue-generating businesses could not have reasonably been expected to fund the operations. " *Id.* at 440.  As the Receiver's expert Ms. Van Tassel has stated, the earnings from SIB's legitimate investments were negligible in comparison to its obligations to CD claimants.  *See* Exhibit 5 at ¶¶ 20, 26 (App. at 155, 157).

[36]     *See also In re Bayou Group, LLC*, 362 B.R. 624, 634 (Bankr. S.D.N.Y. 2007) ("redemption payments of . . . wholly-fictitious profits, as reflected on fraudulent financial statements, were made to earlier investors requesting redemption using funds invested by subsequent investors.  Indeed, it is impossible to imagine any motive for such conduct other than actual intent . . . ."); *Drenis v. Haligiannis,* 452 F. Supp. 2d 418, 429 (S.D.N.Y. 2006) ("Plaintiffs' complaint adequately pleads fraudulent intent on the part of the transferor—namely, the defrauding defendants—who are alleged elsewhere in the complaint to be perpetrators of a Ponzi scheme.  In such cases, courts have found that the debtor's intent to hinder, delay or defraud is presumed to be established.").

fraudulent as to other creditors.  *Byron*, 436 F.3d at 559-60.[37]  The "reasonably equivalent value" element requires the transferee to show that he exchanged "reasonably equivalent value" for what he received.  *Res. Dev. Int'l, LLC,* 487 F.3d at 302.  Both elements are assessed as of the time of the transfer.  *See Slone v. Lassiter,* 406 B.R. 778, 805 (Bankr. S.D. Ohio 2009) ("The critical time to determine whether a debtor receives reasonably equivalent value is the time of the transfer."); *Armstrong*, 2010 WL 1141158, at *19 (Objective good faith does not exist if "the facts would have caused a reasonable transferee to inquire into whether the transferor's purpose in effectuating the transfer was to delay, hinder, or defraud the transferor's creditors.").

But the Court need not consider the good faith element because the Stanford Net Winners are unable, as a matter of law, to show that they exchanged reasonably equivalent value for their Net Winnings.  "The vast majority of courts that have considered the issue have held that a debtor does not receive reasonably equivalent value for any payments made to investors that represent false profits."  *Carnie*, 2007 WL 1112591, at *12 (citing *In re Hedged-Investors Assocs., Inc.*, 84 F.3d at 1290); *Scholes,* 56 F.3d at 757-58.  "[I]nvestors in illegal Ponzi schemes have only provided reasonably equivalent value up to the portion of their actual investment in the scheme.  The false profits they may have gained from the illegal scheme are not reasonably equivalent value."  *Carnie*, 2007 WL 1112591, at *12.

> When causes of action are brought under UFTA against Ponzi scheme investors, the general rule is that to the extent innocent investors have received payments in excess of the amounts of principal that they originally invested, those payments are avoidable as fraudulent transfers. . . .

---

[37]     In addressing the objective good faith element, "courts typically assess whether the investors ignored 'red flags' revealing the true nature of the challenged investment. . . . If a winning investor should have known his or her investment was 'too good to be true,' the court will void the return of principal to that investor." *SEC v. Forte*, Civil Nos. 09-63, 09-64, 2010 WL 939042, at *6 (E.D. Pa. Mar. 17, 2010).  Although claims for "principal" payments are not the subject of this Motion, the Receiver will prosecute claims for those amounts against Stanford Net Winners and other Stanford Investors who cannot show that they received their payments in good faith.

Brief in Support of
Receiver's Motion for Partial Summary Judgment
Against Certain Stanford Net Winner Investors                                    14

> Payments of amounts up to the value of the initial investment are not . . . considered a "return of principal," because the initial payment is not considered a true investment.  Rather, investors are permitted to retain these amounts because they have claims for restitution or rescission against the debtor that operated the scheme up to the amount of the initial investment.  Payments up to the amount of the initial investment are considered to be exchanged for "reasonably equivalent value," and thus not fraudulent, because they proportionally reduce the investors' rights to restitution.  If investors receive more than they invested, "[p]ayments in excess of amounts invested are considered fictitious profits because they do not represent a return on legitimate investment activity."

*Donell*, 533 F.3d at 770, 772 (internal citations omitted); *see also Forte*, 2009 WL 4809804, at *4 (approving consent decree against winning investors based on the above-quoted standard from *Donell*).  However, even investors who may be able to show reasonably equivalent value up to the amount of their initial investment *must also prove their good faith* in order to retain the purported "return" of those funds.

Because the reasonably equivalent value element of the section 24.009(a) defense is absent as a matter of law, it would not matter if the Stanford Net Winners had received their Net Winnings in objective good faith (which the Receiver disputes).  They still would have no defense.  *Byron*, 436 F.3d at 560 ("We need not draw a conclusion on good faith, however, as his defense would still fail because he did not receive the transfers from RDI in exchange for reasonably equivalent value."); *Carnie*, 2007 WL 1112591, at *12 ("[T]he mere fact that the transferee acted in good faith, without any intent to assist the debtor to defraud or evade creditors, is insufficient to relieve the transferee of liability if the transfer was exchanged for less than reasonably equivalent value.")  Therefore, the Stanford Net Winners are liable to the Receiver for their Net Winnings under TUFTA section 24.005(a)(1).

**B.** **The Stanford Net Winners are liable for their Net Winnings under section 24.005(a)(2), the "constructive fraud" provision of TUFTA.**

The Stanford Net Winners are also liable as a matter of law under section 24.005(a)(2) of TUFTA, the constructive fraud provision.  Under this provision, a transfer is deemed fraudulent in law if the debtor—SIB, in this case—(1) made it "without receiving a reasonably equivalent value in exchange" and (2) either knew or should have known that it would be left with unreasonably small capital or was incurring debts beyond its ability to pay. TEX. BUS. & COM. CODE ANN. § 24.005(a)(2).

The first element is conclusively established because, as discussed in the preceding section, an investor in a Ponzi scheme does not give reasonably equivalent value for transfers that he receives in excess of the amount of his investment.

The second element is also conclusively proven because it is presumed, as a matter of law, that a debtor engaged in a Ponzi scheme has unreasonably small capital or is incurring debts he will be unable to pay.  "[A] Ponzi scheme … is, as a matter of law, insolvent from its inception." *Byron*, 436 F.3d at 559; *see also Alguire*, 628 F.3d at 176 (same).  A finding that the debtor "was engaged in a Ponzi scheme—and thus was insolvent from the inception of its business [and therefore unable to pay its debts]—likewise compels the conclusion that the [d]ebtor was operating with unreasonably small capital at the time the transfers in question were made." *In re Canyon Sys. Corp.*, 343 B.R. 615, 650 (Bankr. S.D. Ohio 2006).  Stating the presumption in the language of UFTA,

> [p]roof that transfers were made pursuant to a Ponzi scheme generally establishes that the scheme operator "[w]as engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction," . . . or "[i]ntended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due."

*Donell*, 533 F.3d at 770-71; *see also Armstrong,* 2010 WL 1141158, at *21 (collecting authorities).  The evidence establishes that the Stanford enterprise, including SIB, was insolvent from its inception and, therefore, that SIB knew or should have known that it would be left with unreasonably small capital or was incurring debts beyond its ability to pay when it made the transfers to the Stanford Net Winners.[38]

Thus, because SIB is conclusively presumed to have known that it had unreasonably small capital and was unable to pay its debts, and because the Stanford Net Winners, as a matter of law, did not give reasonably equivalent value for their Net Winnings, TUFTA section 24.005(a)(2) provides a second basis upon which the Receiver should be granted summary judgment.

## CONCLUSION & PRAYER

For the foregoing reasons, the Receiver requests that the Court grant partial summary judgment that the Receiver recover from each of the Stanford Net Winners all amounts SIB paid to the Stanford Net Winners in excess of their respective investments in SIB; prejudgment and post-judgment interest thereon; and costs and attorneys' fees, as permitted by section 24.013 of the Texas Business and Commerce Code, in amounts to be determined at a later date.  The Receiver also requests such other and further relief to which he may be justly entitled.

---

[38]      Exhibit 5 at ¶¶ 8, 19-20, 25-26 (App. at 149-150, 154-155, 157); Exhibit 6 at ¶¶ 5, 34-47 (App. at 204-205, 219-228).

Dated:  June 7, 2011                          Respectfully submitted,

                                              **BAKER BOTTS L.L.P.**

                                              By:  /s/ Kevin M. Sadler
                                                  Kevin M. Sadler
                                                  Texas Bar No. 17512450
                                                  kevin.sadler@bakerbotts.com
                                                  Robert I. Howell
                                                  Texas Bar No. 10107300
                                                  robert.howell@bakerbotts.com
                                                  David T. Arlington
                                                  Texas Bar No. 00790238
                                                  david.arlington@bakerbotts.com
                                                  1500 San Jacinto Center
                                                  98 San Jacinto Blvd.
                                                  Austin, Texas 78701-4039
                                                  (512) 322-2500
                                                  (512) 322-2501 (Facsimile)

                                                  Timothy S. Durst
                                                  Texas Bar No. 00786924
                                                  tim.durst@bakerbotts.com
                                                  2001 Ross Avenue
                                                  Dallas, Texas 75201
                                                  (214) 953-6500
                                                  (214) 953-6503 (Facsimile)

                                              **ATTORNEYS FOR RECEIVER RALPH S. JANVEY**

## CERTIFICATE OF SERVICE

On June 7, 2011, I electronically submitted the foregoing document with the clerk of the court of the U.S. District Court, Northern District of Texas, using the electronic case filing system of the Court.  I hereby certify that I will serve the Stanford Net Winners individually or through their counsel of record, electronically, or by other means authorized by the Court or the Federal Rules of Civil Procedure.

/s/ Kevin M. Sadler

Kevin M. Sadler