**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| RALPH S. JANVEY, in his capacity as court-appointed receiver for the Stanford International Bank, Ltd., et al. | § § § § | |
| Plaintiff, | § § | |
| v. | § § | Case No. 03:09-CV-0724-N |
| JAMES R. ALGUIRE, et al. | § § | |
| Defendants. | § § § | |

| | | |
|---|---|---|
| RALPH S. JANVEY, in his capacity as court-appointed receiver for the Stanford International Bank, Ltd., et al. | § § § § | |
| Plaintiff, | § § | |
| v. | § § | Case No. 03:10-CV-0366-N |
| MIGUEL VENGER, et al. | § § | |
| Defendants. | § § § | |

| | | |
|---|---|---|
| RALPH S. JANVEY, in his capacity as court-appointed receiver for the Stanford International Bank, Ltd., et al. | § § § § | |
| Plaintiff, | § § | |
| v. | § § | Case No. 03:10-CV-0415-N |
| JUAN JOSE RODRIGUEZ POSADA, et al. | § § | |
| Defendants. | § § § | |

RALPH S. JANVEY, in his capacity as court-appointed receiver for the Stanford International Bank, Ltd., et al.

§
§
§
§

    Plaintiff,

§
§

v.

§

    Case No. 03:10-CV-0478-N

§

GILBE CORP., et al.

§
§
§

    Defendants.

§
§

---

RALPH S. JANVEY, in his capacity as court-appointed receiver for the Stanford International Bank, Ltd., et al.

§
§
§
§

    Plaintiff,

§
§

v.

§

    Case No. 03:10-CV-0528-N

§

BUCK'S BIT SERVICE, INC., et al.

§
§
§

    Defendants.

§
§

---

RALPH S. JANVEY, in his capacity as court-appointed receiver for the Stanford International Bank, Ltd., et al.

§
§
§
§

    Plaintiff,

§
§

v.

§

    Case No. 03:10-CV-0617-N

§

NANCY R. JOHNSON, et al.

§
§
§

    Defendants.

§
§

---

RALPH S. JANVEY, in his capacity as court-
appointed receiver for the Stanford
International Bank, Ltd., et al.

                   Plaintiff,

v.

JAMES C. BARR, et al.

                 Defendants.

§
§
§
§
§
§
§
§
§
§
§
§

Case No. 03:10-CV-0725-N

---

RALPH S. JANVEY, in his capacity as court-
appointed receiver for the Stanford
International Bank, Ltd., et al.

                   Plaintiff,

v.

INDIGO TRUST, et al.

                 Defendants.

§
§
§
§
§
§
§
§
§
§
§
§

Case No. 03:10-CV-00844-N

---

RALPH S. JANVEY, in his capacity as court-
appointed receiver for the Stanford
International Bank, Ltd., et al.

                   Plaintiff,

v.

TONYA DOKKEN, et al.

                 Defendants.

§
§
§
§
§
§
§
§
§
§
§

Case No. 03:10-CV-0931-N

RALPH S. JANVEY, in his capacity as court-      §
appointed receiver for the Stanford             §
International Bank, Ltd., et al.                 §
                                                §
                    Plaintiff,                  §
                                                §
v.                                              §          Case No. 03:10-CV-1002-N
                                                §
JOSE MANUEL FERNANDEZ, et al.                    §
                                                §
                    Defendants.                 §
                                                §

Brief in Support of Joint Response to the
Receiver's Motion for Partial Summary Judgment

TABLE OF CONTENTS

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENTS AND ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

A.      Summary Judgment Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

B.      The Undisputed Material Facts Prove Both Elements Of The Investors' Affirmative Defense      2

        1.      Investors Received Their CD Interest In Good Faith . . . . . . . . . . . . . . . . . . . . . . . . . 3

        2.      Defendants Exchanged Reasonably Equivalent Value . . . . . . . . . . . . . . . . . . . . . . . . 5

C.      Alternatively The Evidence Raises Numerous Genuine Issues Of Fact . . . . . . . . . . . . . . . . . . . 9

        1.      There May Be A Genuine Issue About Whether Investors Received Their CD
                Interest In Good Faith . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        2.      There May Be A Genuine Issue About Whether There Was An Exchange Of
                Reasonably Equivalent Value For The CD Interest That SIBL Paid . . . . . . . . . . . . . 10

        3.      There Is A Genuine Issue About How Much CD Interest Each Investor Actually
                Received . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        4.      There Is A Genuine Issue About When The UFTA Limitations Period Began To
                Run . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        5.      There Is A Genuine Issue About When SIBL Became Insolvent . . . . . . . . . . . . . . . 13

D.      Equity Does Not Support The Relief Requested . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        1.      The Court Should Not Create More Net Losers . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        2.      The Court Should Determine Whether The Receiver's Claims Generate Any
                Meaningful Benefit To The Estate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        3.      The Court Should Not Enter Judgments That Unfairly Punish Investors Who Reside
                In The United States . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

E.      The Receiver's Motion Contains Procedural Defects . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

        1.      This Court Lacks Jurisdiction Over Defendants That Have Not Been Served And
                Have Not Appeared In This Lawsuit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

        2.      The Receiver Has Incorrectly Sued Individuals Who Neither Purchased CDs Nor
                Received CD Proceeds In Their Individual Capacity . . . . . . . . . . . . . . . . . . . . . . . . 17

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

### TABLE OF AUTHORITIES

CASES

*AEP Energy Servs. Gas Holding Co. v. Bank of Am.*, 626 F.3d 699 (2d Cir. 2010) . . . . . . . . . . . . . . .   10

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

*Donell v. Kowell*, 533 F.3d 762 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8

*In re Carrozzella & Richardson*, 286 B.R. 480 (D. Conn. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . .   6, 10

*In re Endeavour Highrise, L.P.*, 432 B.R. 583 (Bankr. S.D. Tex. Jul. 13, 2010) . . . . . . . . . . . . . . . .   18

*In re IFS Fin. Corp.*, 417 B.R. 419 (Bankr. S.D. Tex. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5, 6

*Janvey v. Adams*, 588 F.3d 831 (5th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3, 5, 6, 8, 9, 10, 15

*Methodist Healthcare Sys. of San Antonio, Ltd. v. Rankin*, 307 S.W.3d 283 (Tex. 2010) . . . . . . . . . .   10

*Routman v. Auto. Data Processing, Inc.,* 873 F.2d 970 (6th Cir.1989) . . . . . . . . . . . . . . . . . . . . . . .   17

*Scholes v. Lehmann*, 56 F.3d 750 (7th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7

*SEC v. Forte,* 2009 WL 4809804 (E.D. Pa. Dec. 15, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8

*SEC v. Res. Dev. Int'l, LLC*, 487 F.3d 295 (5th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5

*Stanley v. Trinchard*, 2010 WL 3168113 (E.D. La. Aug. 9, 2010) . . . . . . . . . . . . . . . . . . . . . . . . . .   14

*United States v. Diebold, Inc*., 369 U.S. 654 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

*Warfield v. Byron*, 436 F.3d 551 (5th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

*Warfield v. Carnie*, 2007 WL 1112591 (N.D. Tex. Apr. 13, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . .   7

STATUTES AND RULES

28 U.S.C. § 408 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   18

FED. R. CIV. P. 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

TEX. BUS. & COMM. CODE § 24.002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5, 13, 17

TEX. BUS. & COMM. CODE § 24.004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5, 6

TEX. BUS. & COMM. CODE § 24.009 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

TEX. BUS. & COMM. CODE § 24.008 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13, 17

TEX. BUS. & COMM. CODE § 24.010 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12, 13

As required by Local Civil Rule 56.5, the ninety investors listed in appendix Exhibit 1 (collectively, "Investors") file this brief in support of their joint response to the Receiver's Motion for Partial Summary Judgment.

### STATEMENT OF FACTS

1.      The Investors dispute the Receiver's bare conclusion that they did not receive the interest earned from their certificates of deposit ("CDs" or singularly "CD") from Stanford International Bank Ltd. ("SIBL") in good faith.  (Receiver's Br. [Doc. 615-1] at 15, No. 3:09-CV-724.)  They also dispute Karyl Van Tassel's conclusion that Investors could have known SIBL was engaging in fraudulent activity despite the Stanford companies' successful efforts to conceal that from its own financial advisors and regulators.  (Van Tassel Depo., Ex. 4 at App. 263-68, 307:24-310:17.)

2.      It is undisputed that each of the Investors purchased one or more CDs offered by SIBL.  (Investor Decls., Ex. 2.)  Virtually all of the investors purchased their CDs based upon the contractual rate of interest being offered at the time.  (*Id.*)  The interest rate SIBL offered appeared to be fairly good but not so high that they would have suspected that SIBL might be a fraud.  (*Id.*)  Had they suspected that SIBL was not legitimate, they would not have invested with SIBL.  (*Id.*)

3.      The Investors were not SIBL insiders and had no knowledge of and were not involved in its operations.  (*Id.*)  Based upon the information available to them, Investors believed SIBL was an actual bank offering a legitimate CD product.  (*Id.*)  They felt those kind of investments were generally regarded as safe and that this one was safe because SIBL marketed and sold its CDs through their financial advisors, most of whom were located in the United States.  (*Id.*)  Any SIBL materials that they saw looked professional and legitimate.  (*Id.*)

4.      The Investors did not suspect that SIBL might be insolvent, fraudulent, or a Ponzi scheme engaging in fraudulent activity until after the Securities & Exchange Commission filed its lawsuit.  (*Id.*)  They all received their CD interest under ordinary circumstances and for ordinary reasons before that point in time.  (*Id.*)

5.      The individual Investors did not have the expertise and/or the information to even form an opinion about the make-up of SIBL's portfolios, its year-over-year returns, its choice of auditing firms, or the regulatory environment in Antigua.  (*Id.*)  They assumed that regulators, including those in the United States, would be monitoring for those kinds of dangers.  (*Id.*)

A<small>RGUMENTS AND</small> A<small>NALYSIS</small>

**A.      Summary Judgment Standard**

Courts may grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. F<small>ED</small>. R. C<small>IV</small>. P. 56(a).  In making this determination, courts must view all evidence and draw all reasonable inferences in the light most favorable to the respondent.  *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). The movant has the ultimate burden to show there is an absence of evidence supporting the respondent's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

**B.      The Undisputed Material Facts Prove Both Elements Of The Investors' Affirmative Defense**

Under the UFTA, investors may keep any funds they received in good faith and for which they exchanged reasonably equivalent value.  T<small>EX</small>. B<small>US</small>. & C<small>OMM</small>. C<small>ODE</small> §24.009(a).  That defense has two elements although the Receiver only addresses one of them.  (Receiver's Br. [Doc. 615-1] at 10, 14-15, No. 3:09-CV-724.)

### 1.      Investors Received Their CD Interest In Good Faith

That the Investors received their CD interest in good faith is not in serious dispute. Courts use an objective standard to determine good faith. *Warfield v. Byron*, 436 F.3d 551, 559-60 (5th Cir. 2006). They look beyond the recipient's subjective belief to what he or she "knew or should have known." *Id.*

The Court has already determined that investors could not have known about the "complex, long-lasting, intentionally-concealed" Ponzi scheme until after the SEC filed its lawsuit and the Court appointed the Receiver. (Order [Doc. 109] at 14, 18, No. 3:10-CV-346.) The facts underlying the Receiver's claims were "inherently undiscoverable" during that time. (*Id.* at 14.) This is consistent with the Fifth Circuit's ruling that the "innocent investors" had actual "ownership interests in and legitimate claims to the proceeds of the CDs that they purchased." *Janvey v. Adams*, 588 F.3d 831, 835 (5th Cir. 2009).

The Receiver's brief offers no evidence challenging the Investors' good faith, just a bare conclusion that he disputes it. (Receiver's Br. [Doc. 615-1] at 15, No. 3:09-CV-724.) The Receiver's expert also concedes that she has no evidence about what each Investor actually knew:

> Q:      I think you said earlier, you didn't actually speak to any of
>         the investors, correct?
> A:      Did not, no.
>
>                        * * *
>
> Q:      But if an investor comes and says, "I never saw certain of
>         these materials," you'd have no basis to dispute it, correct?
> A:      I would not, no.

(Van Tassel Depo, Ex. 4 at App. 269-70, 311:19-20, 312:11-14.) More importantly, she also concedes that she has no opinion about what the Investors should have known about SIBL:

> Q:    … are you going to offer an opinion that any of the
>        investors knew or should have known that they were
>        receiving payments from a Ponzi scheme?
> A:    I will not be expressing an opinion that they should.
>
>                         *  *  *
>
> Q:    Now, so are you saying that they should have known?
> A:    That's not what I'm saying.  That's not an opinion I've
>        been form -- asked to form.

(*Id*. at App. 265, 307:13-18, 307:21-24.)

She goes on to speculate that some people outside of Stanford could have been concerned by the make-up of SIBL's portfolios, its year-over-year returns, its choice of accounting firms, or the regulatory environment in Antigua.  (*Id*. at App. 265-68, 307:24-310:17.)  Ms. Van Tassel, however, identified those concerns with the benefit of hindsight, the entire universe of records from 130 Stanford entities, and FTI's $19 million investigation.  (*Id*. at 269-70, 311:21-312:10; Receiver's Br. [Doc. 615-1] at 7, No. 3:09-CV-724; Receiver's Fee Applications [Docs. 384, 669, 820, 914, 1033, 1084, 1132, 1163, 1183, 1247, 1297, 1383], No. 3:09-CV-298.)  The individual Investors did not have the expertise and/or the information to even form an opinion about those concerns.  (Investors' Decls., Ex. 2.)  It is ridiculous to think that each and every Investor should have suspected that SIBL was a sophisticated Ponzi scheme when their own financial advisors did not suspect it and no regulatory body had ever publicly alleged it until February 2009.  (Order [Doc. 109] at 14, 18, No. 3:10-CV-346.)  The Receiver himself admits that Stanford secretly bribed regulators and reverse-engineered its portfolios and financial statements to "falsely assure investors that SIB was financially strong and that SIB CDs were attractive low-risk investments."  (Receiver's Br. [Doc. 615-1] at 7-8, No. 3:09-CV-724.)

Stanford's deception worked well.  The Investors were not insiders and had no knowledge of SIBL's operations.  (Investors' Decls., Ex. 2.)  What they saw from SIBL

convinced them that it was an actual bank offering legitimate CDs.   (*Id.*)   CDs are generally regarded as safe investments and these were marketed and sold through their trusted financial advisors, most of whom were located in the United States.   (*Id.*)   None of them knew that SIBL was alleged to be insolvent, or a Ponzi scheme, or engaged in fraudulent activity until after the SEC filed its lawsuit.   (*Id.*)

In short, the Receiver has effectively conceded this issue.   To do otherwise would defy the previous findings of this Court and the Fifth Circuit holding that the Investors had legitimate interests in their CDs and no reason to suspect fraudulent activity.   *Janvey*, 588 F.3d at 834-35; *see also* Order [Doc. 109] at 14, 18, No. 3:10-CV-346.

### 2.   Defendants Exchanged Reasonably Equivalent Value

Every CD interest payment the Investors received was supported by an exchange of reasonably equivalent value.   The UFTA's definition of value includes transfers and obligations that satisfy an antecedent debt.   TEX. BUS. & COMM. CODE § 24.004(a); *see also In re IFS Fin. Corp.*, 417 B.R. 419, 441 (Bankr. S.D. Tex. 2009).   Courts consider whether the exchange of value preserved the debtor's net worth.   *SEC v. Res. Dev. Int'l, LLC*, 487 F.3d 295, 301 (5th Cir. 2007).   That valuation is not made in hindsight, but at the time of the transfer.   *In re IFS Fin. Corp.*, 417 B.R. at 442.   A payment made "solely" for the benefit of a third party does not furnish reasonably equivalent value, but a transfer that reduces the debtor's liabilities by an equal amount does.   *Res. Dev. Int'l, LLC*, 487 F.3d at 301-02; *In re IFS Fin. Corp.*, 417 B.R. at 442.

Every dollar that SIBL paid in CD interest was exchanged for an equal reduction to the antecedent debt it owed its investors.   TEX. BUS. & COMM. CODE § 24.002(5).   In other words, the "estate's liabilities were reduced in the same amount as the transfer." *In re IFS Fin. Corp.*, 417 B.R. at 441-42. That kind of dollar-for-dollar exchange would take place in an arm's length

transaction and, therefore, satisfies the very definition of reasonably equivalent value. *Id.* at 441; *see also* TEX. BUS. & COMM. CODE § 24.004(d).

The Receiver wants to ignore the fact that every one of these CDs was a contract for which SIBL was liable. SIBL's CD interest payments were not gratuitous transfers—they were contractual payments made according to its contractual liability. That fact cannot be disputed. The Fifth Circuit has already examined SIBL's relationship with its investors and found as follows:

> It is undisputed that the Investor Defendants received the CD proceeds pursuant to written certificate of deposit agreements with the Stanford Bank, which granted them certain rights and obligations. There was a debtor-creditor relationship between the Investor Defendants and the Stanford Bank based on written agreements well before the underlying SEC enforcement action against Stanford and the resulting receivership and restraining order. . . The Investor Defendants have legitimate ownership interests in their CD proceeds . . .

*Janvey,* 588 F.3d at 834-35.

Courts faced with the same issue routinely hold that payments of interest reducing the debtor's contractual liability are an exchange of reasonably equivalent value under the UFTA.[1] For example, in *In re Carrozzella & Richardson*, investors deposited money into a Ponzi scheme that guaranteed returns between 8% and 15%. 286 B.R. 480, 483-84 (D. Conn. 2002). After the Ponzi scheme was placed in bankruptcy, the trustee filed adversary actions to recover interest payments made to investors within four years of the petition date. *Id.* at 484. The Court reasoned that those investors exchanged reasonably equivalent value as follows:

> In exchange for the interest paid to the Defendants, the Debtor received a dollar-for-dollar forgiveness of a contractual debt. This satisfaction of an antecedent debt is "value," . . . and in this case "reasonably equivalent value." To the extent that these Defendants

---

[1]    To avoid filing long and duplicative string citations, the Investors refer the Court to and incorporate the additional cases and analysis in Defendant Thomas J. Moran's Brief.  ([Doc. 682] at 5-17, No. 3:09-CV-724.)

> had not been paid the interest owed, they would have been
> creditors of the Debtor's bankruptcy estate, asserting claims for
> unpaid interest.

*Id.* at 490-91.

The Receiver's cases on this issue are clearly distinguishable.  In *Warfield v. Carnie*, the Ponzi scheme purportedly invested in "prime bank securities" that its marketing materials said could generate a 4% monthly return.  2007 WL 1112591, *2 (N.D. Tex. Apr. 13, 2007).  The defendants in that case merely had "investment contracts" that were not contractual obligations creating an antecedent debt.  *Id.* at *13.  The court ruled that the investors merely had an illegal investment agreement that was not analogous to a loan for interest.  *Id.* at *12-13.  The court also rejected another defendant's argument that he provided "administrative" value by recruiting investors into the Ponzi scheme.  *Id.* at *4-5, 13.  That case did not address whether payments satisfying an antecedent debt are reasonably equivalent value under the UFTA.

In *Scholes v. Lehmann*, the mastermind of a Ponzi scheme created three limited partnerships and sold limited-partner interests to the investing public.  56 F.3d 750, 752 (7th Cir. 1995).  Investors thought the partnerships were trading commodities that could return 10% to 20% in profits each month.  *Id.* The investments, however, were not contractual obligations to pay a set rate of interest.  The receiver in that case sued one investor under the old Illinois fraudulent conveyance statute, not the UFTA.  *Id.* at 753.  The court found that fictitious investment profits paid to the investor were not supported by "full, fair, commensurate" consideration under the old statute because they depleted corporate resources without an "offset by an equivalent benefit to the estate."  *Id.* at 756. 757. That case did not address whether payments satisfying an antecedent debt are reasonably equivalent value under the UFTA.[2]

---

[2]   The court also ruled that the Ponzi schemer's companies were his alter egos and, therefore, could be liable for his personal obligations to his ex-wife.  *Id.* at 758. His ex-wife, however, still had to prove that the payments

In *SEC v. Forte,* the Ponzi scheme sold limited-partner interests in a company that supposedly traded futures contracts.  2009 WL 4809804, *1 (E.D. Pa. Dec. 15, 2009).  The investments were not contractual obligations to pay a set rate of interest.  The Court approved the receiver's settlements with two investors who could afford to pay back their net profits but did not address whether payments satisfying an antecedent debt are reasonably equivalent value under the UFTA.  *Id.* at *3.

In *Donell v. Kowell*, the Ponzi scheme purportedly used investor money to purchase accounts receivable from latex glove manufacturers in Malaysia.  533 F.3d 762, 767 (9th Cir. 2008).  In return, investors were promised a 20% return every ninety days without risk to their principal.  *Id.*  Of the 800 investors who realized a profit, the receiver sued one who he believed had invested "the sum of $.00." *Id*. at 768.  The District Court awarded summary judgment for the profit that investor received within the four-year limitations period.  *Id.* at 769.  The court did not analyze the investment agreement itself or whether that agreement created an antecedent debt under the UFTA.  It simply rejected the investor's characterization that his investment was a "note" under federal securities laws and treated the profits like gratuitous Ponzi payments.  *Id.* at 768, 777-78.

Those cases are materially different from the one before this Court.  Here, the Fifth Circuit has already ruled that the Investors had legitimate "certificate of deposit agreements . . . which granted them certain rights and obligations." *Janvey*, 588 F.3d at 834-35.  The only thing left for this Court to do, therefore, is to determine the extent that SIBL's interest payments satisfied those antecedent obligations.

---

she received from the Ponzi scheme benefitted the estate in an equivalent value.  *Id.*  Any claim she had against the estate was subject to extra scrutiny because it was an "intrafamilial transfer."  *Id.*  Obviously, that is not an issue in this case.

**C.      Alternatively The Evidence Raises Numerous Genuine Issues Of Fact**

    **1.      There May Be A Genuine Issue About Whether Investors Received Their CD Interest In Good Faith**

If the evidence does not support a finding of good faith, it at least raises a genuine issue of fact. This Court already determined that SIBL's investors could not have known about the "complex, long-lasting, intentionally-concealed" Ponzi scheme until after the SEC filed its lawsuit and the Court appointed the Receiver. (Order [Doc. 109] at 14, 18, No. 10-CV-0346.) The facts underlying the Receiver's claims were "inherently undiscoverable" during that time. (*Id.* at 14.) Likewise, the Fifth Circuit ruled that the "innocent investors" had actual "ownership interests in and legitimate claims to the proceeds of the CDs that they purchased." *Janvey*, 588 F.3d at 835.

The Investors were not insiders and had no knowledge of SIBL's operations. (Investor Decls., Ex. 2.) What they saw from SIBL was convincing and seemed to be from an actual bank offering legitimate CDs. (*Id.*) CDs are generally regarded as safe investments and these were marketed and sold through their trusted financial advisors in the United States. (*Id.*) These Investors purchased the same CDs, at the same rates, during the same periods of time as more than 28,000 other investors who were falsely assured that SIBL was financially strong and offered low-risk investments. (Receiver's Br. [Doc. 615-1] at 7, No. 3:09-CV-724; Van Tassel Depo., Ex. 4 at App. 271-72  337:1-6, 338:15-22.) The only thing unique about these Investors is that their CDs matured or were otherwise redeemed pursuant to their express contractual terms before the SEC filed its lawsuit. Viewing these objective facts in favor of respondents, a reasonable jury could agree with this Court that the scheme was "inherently undiscoverable" before that time and find that the Investors received their CD interest in good faith. (Order [Doc. 109] at 14, 18, No. 3:10-CV-346.)

2.      **There May Be A Genuine Issue About Whether There Was An Exchange Of Reasonably Equivalent Value For The CD Interest That SIBL Paid**

If the evidence does not support a finding of reasonably equivalent value, it at least raises a genuine issue of fact. The existence of reasonably equivalent value is a fact question. *In re Carrozzella*, 286 B.R. at 488-90 (D. Conn. 2002). The Receiver presumes—without explanation—that these CDs did not create a contractual, antecedent debt to support an exchange of reasonably equivalent value. (Receiver's Br. [Doc. 615-1] at 10, No. 3:09-CV-724.) These CDs, however, were real documents that stated an actual interest rate backed by consideration. (SIBL CD, Ex. 3.) Viewing those facts in favor of respondents, a reasonable jury could agree with the Fifth Circuit that the Investors had legitimate "certificate of deposit agreements . . . which granted them certain rights and obligations." *Janvey*, 588 F.3d at 834-35.

3.      **There Is A Genuine Issue About How Much CD Interest Each Investor Actually Received**

The Receiver's damage claims are both unsupported and flawed. To obtain summary judgment, the Receiver has the burden to prove his damages. *See, e.g., AEP Energy Servs. Gas Holding Co. v. Bank of Am.*, 626 F.3d 699, 740 (2d Cir. 2010) (damages awarded on summary judgment if they are readily calculable based upon undisputed facts). He seeks a judgment against each Investor for their "net winnings," which he calculates as all amounts that SIBL paid in excess of their investments. (Receiver's Br. [Doc. 615-1] at 9, No. 3:09-CV-724.) But he offers no factual evidence showing each person's CD investments or the amounts that SIBL paid them in interest. Instead he relies solely upon Ms. Van Tassel's bare conclusion that the amounts attached to her declaration are correct. (Receiver's App. [Doc. 616-1] at 157, ¶ 26, No. 3:09-CV-724.)

The Receiver's failure to prove his damages is alarming for several reasons.  First, there is no transparency for the Investors—much less the Court—to check the Receiver's calculations or test them for errors or omissions.  At the very least, the Receiver should recount each Investors' CD purchases and the withdrawals or payments they received.  Most of the Investors do not have that information and would have gone to their local Stanford offices to get it. (Investor Decls., Ex. 2; Van Tassel Depo., Ex. 4 at App. 278-79, 352:2-353:17.)  When requested in discovery, the Receiver's counsel admitted that information was probably in the Receiver's warehouse but could not be located.  That fact was confirmed in Ms. Van Tassel's deposition. (Van Tassel Depo., Ex. 4 at App. 276-77, 349:19-350-9.)

Second, the Receiver's discovery responses consisted of 140,984 .pdf documents that were unlabeled and unorganized.  (Baker Botts Letter, Ex. 5; Baker Botts E-mail, Ex. 6.) Among other things, the Receiver objected to requests for documents supporting the Receiver's calculation of Defendants' net winnings, documents evidencing the periodic statements that SIBL generated, and documents evidencing the method that SIBL used to determine the interest rate for Defendants' CD. (Receiver's Objections and Responses, Ex. 7.)  As a result, most Investors do not have the information needed to evaluate whether the Receiver's calculations are accurate.

Third, the Receiver made a curious decision to group together accounts for separate individuals and entities as if they were a single defendant.  (Receiver's App. [Doc. 616-1] at 193-196, No. 3:09-CV-724.)  Ms. Van Tassel admits doing that based upon perceived relationships between their names, addresses, and social security numbers but says those parties are not jointly liable or alter egos.  (Van Tassel Depo., Ex. 4 at App. 273-75, 345:21-347:23.)  The Receiver,

therefore, has not alleged—much less proven—the separate damages sought from each of those parties.

Finally, of the Investors who do have their SIBL account statements, six of them affirmatively challenge the Receiver's numbers and/or provided him with alternate calculations:

      a.      Emma Walther - $0.00 in CD interest

      b.      Gaines D. Adams - $98,889.56 in CD interest

      c.      Hardee & Betty Jo Brian - $78,503.28 in CD interest

      d.      Steve Burnham - $232,205.74 in CD interest

      e.      Jose Manuel Fernandez - $5,411.52 in CD interest

      f.      Bob Soule - $40,476.58 in CD interest

(Nepi Decl., Ex. 2 at App. 178; SIBL Account Statements, Ex. 8.)   The attached account statements, which are the only ones in evidence, show significant errors and omissions in the Receiver's calculations.[3]   Combined with the fact that the Receiver is unable or unwilling to search his warehouse for similar records pertaining to the other Investors could lead a reasonable jury to conclude that his damage calculations are incomplete and inaccurate.

### 4. There Is A Genuine Issue About When The UFTA Limitations Period Began To Run

The Receiver's UFTA claims are based upon actual fraud because he alleges that Stanford intended to hinder, delay, or defraud its creditors.   (Receiver's Br. [Doc. 615-1] at 12, No. 3:09-CV-724.)   Those claims expire within (a) four years after the transfer was made or the obligation was incurred or (b) within one year after they could reasonably have been discovered by the claimant.   TEX. BUS. & COMM. CODE § 24.010(a)(1).   That provision is a strict statute of repose that cannot be tolled based upon equitable considerations.   *Methodist Healthcare Sys. of*

---

[3]    Gaines Adams has hundreds of pages of SIBL records that were produced to the Receiver during discovery. The undersigned attaches a summary of those records for the sake of economy.

*San Antonio, Ltd. v. Rankin*, 307 S.W.3d 283, 286 (Tex. 2010). Here the Receiver's calculations of "net winnings" are not limited in time and include all amounts that each Investor received in excess of his or her total CD investment. (Receiver's Br. [Doc. 615-1] at 9, No. 3:09-CV-724.) He, therefore, is clearly proceeding under the one-year "discovery rule" in § 24.010(a)(1).

The Receiver's own internally inconsistent theories in this case raise an inherent fact question about whether the one-year discovery rule applies. The Receiver's claims are timely if he brings them within one year after the transfer "could reasonably have been discovered by the claimant." § 24.010(a)(1). The UFTA defines the "claimant" as SIBL's creditors. §§ 24.002(4), 24.008(a). There is no doubt that each Investor was a creditor of SIBL's during the time they owned CDs. § 24.002(4). So, on the one hand, the Receiver avails himself of the one-year discovery rule based on the assumption that the Investors could not have discovered that SIBL's transfers were fraudulent. (*See* Order [Doc. 109] No. 3:10-CV-346.) But then, on the other hand, he says the Investors did not act in good faith because they could have discovered that SIBL was fraudulent. (Receiver's Br. [Doc. 615-1] at 15, No. 3:09-CV-724; Van Tassel Depo., Ex. 4 at App. 280, 354:13-21.) So long as the Receiver advances both theories, there is an inherent fact question that must be resolved.

     **5.**    **There Is A Genuine Issue About When SIBL Became Insolvent**

For the sake of judicial economy, the Investors incorporate the arguments, analysis, evidence, and citations on this issue stated in the response brief of Carolyn Cranston, et al.

**D.**    **Equity Does Not Support The Relief Requested**

Even if the Court could resolve all factual disputes in the Receiver's favor, it should still deny his motion because equity does not support the relief requested. The Receiver seeks relief under the UFTA's broad equitable provisions. TEX. BUS. & COMM. CODE §24.008(a)(3). When

deciding whether to grant equitable relief, the Court should be mindful that courts of equity must promote and enforce justice, good faith, uprightness, and fairness to all parties.  *See, e.g., Stanley v. Trinchard*, 2010 WL 3168113, *5 (E.D. La. Aug. 9, 2010).

### 1.    The Court Should Not Create More Net Losers

If successful, it is undisputed that the Receiver's lawsuit would create more net losers. The Investors believed that SIBL was a real bank paying interest on legitimate CDs.  (Investor Decls., Ex. 2.)  Based on that belief, many investors paid state and/or federal income tax on their CD interest over the years and could not recover that money now if judgment were entered against them.  (*Id.*)  For example, the period for amending federal tax returns is three years while this lawsuit involves CD interest earned between 1997 and 2009.  (Receiver's App. [Doc. 616-1] at 157, 185.)  The undersigned has asked the Receiver to avoid this result by reducing his claims against Investors by the amount they paid in taxes.  Unfortunately, he refuses to do so.

Allen Stanford has already created enough net losers.  This Court should not assist the Receiver in creating more of them—and certainly not in the name of equity.

### 2.    The Court Should Determine Whether The Receiver's Claims Generate Any Meaningful Benefit To The Estate

It is an express goal of this receivership to "[p]reserve the Receivership Estate and minimize expenses in furtherance of maximum and timely disbursement thereof to claimants." (Order Appointing Receiver [Doc. 10] ¶5(j), No. 3:09-CV-298.)  The Receiver says he takes that charge seriously.  (Receiver's Resp. to Pl.'s Emergency Mot. [Doc. 24] at 8, No. 3:09-CV-724.) But his decision to proceed with these lawsuits for two years while refusing to engage in reasonable settlement discussions belies his disingenuous assertions and is wasteful and unproductive.

The Receiver filed his first clawback lawsuit against SIBL CD holders on July 28, 2009. (Am. Compl. [Doc. 14], No. 3:09-CV-724.)  Although he now admits that the UFTA is the proper basis for bringing such claims, he ignored that fact back then.  (Receiver's Br. [Doc. 615-1] at 1 n.2, No. 3:09-CV-724; *cf.* Am. Compl. [Doc. 14], No. 3:09-CV-724.)  At the time he believed that the best course of action was to ignore the investors' contractual relationship with SIBL and to treat them like complicit relief defendants.  The Receiver's own counsel argued that proceeding with UFTA claims against the net winners would not be cost effective:

> . . . it will be very impractical and I think possibly cost prohibitive in many cases for this Receiver to pursue those claims, especially if we are limited to interest.

(Hr'g Transcript, Ex. 9 at App. 365, 29:1-4.)  Ultimately, this Court ruled that the Receiver was unlikely to prevail on his claims and the Fifth Circuit ruled that those claims were contrary to law.  *Janvey*, 588 F.3d at 834-35.

Over two years later, there is still reason to question whether the Receiver's lawsuits against investors are worth the cost.  Fee applications show he has spent close to $7 million pursuing his ten ancillary lawsuits against investors.[4]  But after almost two years he has only managed to serve and file summary judgment against 187 of the 876 named defendants.[5] (Receiver's App. [Doc. 616-1] at 193-96, No. 3:09-CV-724.)  Many of the unserved defendants appear to be located in foreign countries where the Receiver is unlikely to have his UFTA judgments recognized.

---

[4]    *See* Receiver's Fee Applications [Docs. 384, 669, 820, 914, 1033, 1084, 1132, 1163, 1183, 1247, 1297, 1383], No. 3:09-CV-298.

[5]    The number of unserved parties is actually higher when you take into account the Receiver's decision to group separate individuals and entities together as joint defendants even though they are not alter egos or jointly liable. (Receiver's App. [Doc. 616-1] at 193-196; Van Tassel Depo., Ex. 4 at App. 273-75, 345:21-347:23.)

Even if the Receiver could collect full judgments from all 187 defendants subject to this motion, he would only recover approximately $32 million into the receivership estate.  (*Id.* at 196.)   Taking into account his fees spent pursuing investor litigation, the estate's best net recovery would be approximately $25 million.  Compared to the expected $7.2 billion in claims against the estate, a $25 million net recovery would only repay $347 on a $100,000 claim (or 0.347%).  (*Id.* at 153, ¶ 18.)  So the Receiver's efforts will hardly change the amount distributed to defrauded investors at all.  Even that completely meaningless result is far too optimistic considering that no litigant, no matter how successful, can recover 100% of every judgment from 187 different defendants.  The only people who will ever benefit from the Receiver's misguided efforts are the Receiver and his legions of retained professionals.

Unfortunately the Receiver has refused to engage in reasonable settlement negotiations based upon each Investor's ability to pay.  When the undersigned proposed settlements for some of his clients, the Receiver responded with a very small concession that included the impossible condition that all ninety of the undersigned's other clients must also accept the same terms before the Receiver would settle with any of them.  Such unreasonable tactics prohibit settlement and do the receivership estate a disservice.

### 3. The Court Should Not Enter Judgments That Unfairly Punish Investors Who Reside In The United States

What the Receiver desires is not equitable.  Only about 30% of SIBL's investors are located in the United States.  (Van Tassel Depo, Ex. 4 at App. 271-72, 337:7-338:3.)  The Receiver wants to take money from a minority of the "net winners" and use it to fund distributions to other Stanford investors, the vast majority of whom are located abroad and will never be subject to the same clawback claims in their own country.

Of the 876 named defendants in these lawsuits, the Receiver only seeks judgment against the 187 that he could serve by virtue of the fact that they are located in the United States. Granting summary judgment on the Receiver's UFTA claims would single out and unfairly punish those investors, violating the UFTA's fundamental adherence to "principles of equity." TEX. BUS. & COMM. CODE § 24.008(a)(3). Equity requires consistent treatment among all Stanford investors no matter where they are located. Such drastic relief should either apply consistently and even-handedly or not at all.

**E.     The Receiver's Motion Contains Procedural Defects**

**1.     This Court Lacks Jurisdiction Over Defendants That Have Not Been Served And Have Not Appeared In This Lawsuit**

The Receiver says he only seeks summary judgment against Investors who answered or otherwise appeared before May 24, 2011. (Receiver's Br. [Doc. 615-1] at 1, No. 3:09-CV-724.) His motion, however, asks for summary judgment against the Young Family Cemetary (sic) Trust. (Receiver's App. [Doc. 616-1] at 193, No. 3:09-CV-724.) The Court can take judicial notice of its docket sheet and see that the Young Family Cemetery Trust has not been served, has not accepted service, and has not appeared in this case. As a result, the Court lacks jurisdiction to enter summary judgment against it. *See Routman v. Auto. Data Processing, Inc.,* 873 F.2d 970, 971 (6th Cir.1989).

**2.     The Receiver Has Incorrectly Sued Individuals Who Neither Purchased CDs Nor Received CD Proceeds In Their Individual Capacity**

The Receiver seeks summary judgment against individuals who did not personally receive proceeds from a CD and are not proper parties to this lawsuit. Emma Walther, for example, never owned or benefitted from a CD and only allowed another Investor to receive its SIBL statements at Ms. Walther's address. (Nepi Decl., Ex. 2 at App. 178.)

Dozens of other Investors used an individual retirement account ("IRA") to purchase a CD and to receive the principal and interest from it.  (Investor Decls., Ex. 2.)  The Receiver is trying to recover that money which clearly went to the IRA—not to the individual.  The Receiver cannot simply ignore that important distinction just because he would prefer to have a judgment against the individual.

The distinction between an individual and his or her IRA is created by Congress.  An IRA is a trust or custodial account administered by a fiduciary representative.  28 U.S.C. § 408(a), (h).  Congress designed IRAs to be treated like trusts even if they do not meet every state's requirements for creating a trust.  *In re Endeavour Highrise, L.P.*, 432 B.R. 583, 662 (Bankr. S.D. Tex. Jul. 13, 2010). Like a trust, an IRA is a separate legal entity from its beneficiary.  An IRA may own property and enter into contracts and other transactions through its fiduciary representative.  *Id.* at 663.  For the Receiver to recover property paid into an IRA, he must sue the IRA's fiduciary custodian and then name the beneficiaries as additional parties if he so chooses.  *Id.* at 665.  Here he has done neither.

CONCLUSION

For the reasons stated above, the Investors ask this Court to deny the Receiver's motion for summary judgment based upon the undisputed facts establishing their affirmative defense, numerous genuine issues of fact, the inequities of the relief requested, or procedural deficiencies. They also ask for such other and further relief, general or special, at law or in equity, to which they may otherwise be entitled.

Respectfully submitted,

QUILLING, SELANDER, LOWNDS,
   WINSLETT & MOSER, P.C.
2001 Bryan Street, Suite 1800
Dallas, Texas  75201
Telephone: (214) 871-2100
Fax: (214) 871-2111

By:   */s/ Michael J. Quilling*
      Michael J. Quilling
      State Bar No. 16432300
      Brent Rodine
      State Bar No. 24044870

      ATTORNEYS FOR RESPONDENT


## CERTIFICATE OF SERVICE

On September 6, 2011, I electronically submitted this pleading to the Clerk of Court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the Court.   I hereby certify that I have served all counsel and/or pro se parties of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

*/s/ Michael J. Quilling*